## STATE OF CONNECTICUT *v.* HECTOR HEREDIA
(SC 16182)

McDonald, C. J., and Borden, Katz, Palmer and Sullivan, Js.

Argued March 22—officially released July 4, 2000

*William B. Westcott*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *John Connelly*, state's attorney, and *Terence Mariani*, assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant appeals[1] from the judgment of conviction, following a jury trial, of attempted murder in violation of General Statutes §§ 53a-49[2]

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] General Statutes § 53a-49 provides: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) of this section unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait,

and 53a-54a,[3] assault in the first degree in violation of General Statutes § 53a-59 (a) (5),[4] kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B),[5] and attempted robbery in the first degree in violation of General Statutes §§ 53a-49[6] and 53a-134 (a)

searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime.

"(c) When the actor's conduct would otherwise constitute an attempt under subsection (a) of this section, it shall be a defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[3] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

[4] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[5] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to . . . (B) accomplish or advance the commission of a felony . . . ."

[6] See footnote 2 of this opinion.

(2).[7] The defendant claims that (1) his constitutional rights to be present at trial, to confront the witnesses against him and to testify on his own behalf were violated by the prosecutor's comments relating to the defendant's use of an interpreter, and (2) the prosecutor engaged in a pattern of prosecutorial misconduct. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early morning hours of June 30, 1996, the defendant, Hector Heredia, entered the McDonald's restaurant on Reidville Drive in Waterbury through a rear security door that had been left open inadvertently. He was wearing blue jeans, a red shirt and a white baseball cap. An employee of the restaurant, Chris Acty, saw the defendant run into the restaurant holding a gun. Acty grabbed the defendant's arm and the two men wrestled to the floor. At some point the defendant's gun discharged, wounding Acty in the arm. The defendant then aimed his gun at Acty's chest at close range and pulled the trigger several times, but the gun did not fire.

The restaurant manager, Jesus Quinones, upon hearing the fight and the gunshot, yelled out for everyone to leave the building. Quinones, Acty, and three other employees escaped. As they were fleeing, Quinones saw the defendant start to chase them, and Quinones heard the defendant call out to him, in English, to come back. One employee, Gayle Briggs, fell while attempting to run out of the building. The defendant ran up to Briggs, put his gun to her back, and told her, in English, to stay down, keep still and not look at him. He then told her, in English, to get some money. She explained that only

---

[7] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

the manager could get money because he alone had the key. The defendant then asked Briggs, in English, where the manager was, and when she started to explain, the defendant finished her sentence by saying, "The one with the blue shirt."

The defendant brought Briggs to her feet and led her to the rear door. When they were outside he yelled out, in English, for the manager. After there was no response, the defendant brought Briggs back inside to the service counter. He demanded, in English, that she open one of the cash registers. She explained that it was locked. After the defendant had attempted unsuccessfully to open the cash register himself, he took Briggs to the safe in the manager's office, which also was locked. The defendant then pushed Briggs into a walk-in freezer. At this time, the defendant spoke to Briggs in a mixture of Spanish and English.

Meanwhile, the restaurant employees who had escaped ran through the restaurant parking lot toward Lombard Plaza, a nearby shopping center. Upon realizing that Briggs had been left behind, they returned to the restaurant to look for her. Through the restaurant windows they saw the defendant holding a gun to Briggs. Upon seeing these employees, the defendant came out of the restaurant and chased them through the empty parking lot. One of the employees, Crispin Rojas, stayed in the restaurant parking lot, and eventually he was able to reenter the restaurant and free Briggs from the freezer.

Two of the fleeing employees ran to the Burger King restaurant in the Lombard Plaza, where they were let in by the Burger King manager, who called the police. Two other employees, including Acty, called the police from another store in Lombard Plaza. After hearing Acty's account of the incident and his description of the perpetrator, the two responding police officers pro-

ceeded to the McDonald's. On their way, they noticed a black Oldsmobile in the plaza parking lot that seemed "out of place" because it was not in a parking space and because none of the businesses in the plaza were open at that time. A license plate check later determined that the car belonged to the defendant. The officers then talked to Briggs, Quinones and Rojas, who told them that the perpetrator had run into the woods directly behind the McDonald's. The police secured the perimeter of the woods and summoned two canine units.

The first canine unit arrived with a German shepherd and began to search the woods behind the restaurant. The woods were dense and rocky, with much vegetation, and it was so difficult for the policemen to move around in the woods that one of the officers fell several times while doing so. Approximately twenty-five yards into the woods, the police found a white baseball cap. Shortly thereafter, the second canine unit arrived with a bloodhound. The bloodhound was brought to the baseball cap, sniffed it and followed the scent further into the woods. Approximately twenty-five yards further into the woods, the bloodhound stopped and began to bark. The police officers looked down and saw two feet sticking out from beneath a piece of sheet metal. Underneath the sheet metal was the defendant, his torso in a kind of cave-like depression, with his shoes and shirt off, and a red T-shirt in a ball at his feet. The defendant was taken into custody.

During the canine searches of the woods, Briggs and Quinones were taken to police headquarters to look at mug shots and to give written statements. When word got back to headquarters that the defendant had been taken into custody, Briggs and Quinones were brought back to the restaurant, where they immediately and unequivocally identified the defendant as the perpetra-

tor. Later, Acty identified the defendant from a photographic array.

A search of the rear of the restaurant yielded a small holster and four .38 caliber bullets. The next day, the police found a .38 caliber handgun in the woods behind the restaurant. The serial number on that gun matched that of a gun owned by Andres Baez, the defendant's former roommate. Baez had owned the gun for ten years, until it was stolen from him in November, 1995, while the defendant was living with him. Several days after the incident, a bullet core was found in the restaurant, which ballistic tests matched to the stolen gun.

At trial, the defendant, whose native language is Spanish, availed himself of the services of a Spanish language interpreter, and testified in his own defense through the interpreter. He did not dispute that the alleged crimes had been committed, and he admitted that he was at the restaurant on the night of the robbery. He testified that he had had car trouble that night and that he had attempted to call a tow truck from the McDonald's restaurant. He claimed that as he approached the rear door of the restaurant he was assaulted by an Hispanic male who was wearing sunglasses and holding a gun. According to the defendant, the man hit him on the head with the gun, took his hat and shirt, leaving him with $100 in his wallet. He then pointed the gun at the defendant and told him to run into the woods. The defendant testified further that, although he was dizzy from the blow to his head, he ran, without difficulty on a straight path, through the woods until he stopped and leaned against a board, and that he was in that position when the police found him.[8]

The jury rendered a verdict of guilty on all counts and the trial court rendered judgment in accordance with the verdict. This appeal followed.

[8] The defendant also testified, however, that he was in a prone position when the police found him.

I

The defendant first claims that certain questions and comments by the state violated his rights under the fifth, sixth, and fourteenth amendments to the United States constitution,[9] and under article first, § 8, of the Connecticut constitution.[10] The defendant's claim is twofold. Specifically, he argues that the state (1) during its cross-examination of him, and (2) during its closing argument, improperly challenged the legitimacy of his use of a Spanish language interpreter, and thereby impermissibly burdened his constitutional right to have the court proceedings translated into his native language.[11]

[9] The fifth amendment to the United States constitution provides in relevant part: "No person . . . shall be compelled to in any criminal case to be a witness against himself . . . ."

"The opportunity to testify is . . . a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." (Internal quotation marks omitted.) *State* v. *Shinn*, 47 Conn. App. 401, 410, 704 A.2d 816 (1997), cert. denied, 244 Conn. 913, 914, 713 A.2d 832, 833 (1998); *Rock* v. *Arkansas*, 483 U.S. 44, 51–52, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987).

The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . and to have the assistance of counsel for his defense."

The due process clause of the fourteenth amendment to the United States constitution provides in relevant part: "[N]or shall any State deprive any person of life, liberty or property, without due process of law . . . ."

[10] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . [and] to be confronted by the witnesses against him . . . . No person shall be . . . deprived of . . . liberty . . . without due process of law . . . ."

The defendant has not offered any independent and adequate analysis under the state constitution. We therefore confine our analysis to his claims under the federal constitution. *State* v. *Beltran*, 246 Conn. 268, 277 n.7, 717 A.2d 168 (1998); *State* v. *Porter*, 241 Conn. 57, 133 n.77, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

[11] There is no dispute that, during the entire trial, the proceedings were translated into Spanish for the benefit of the defendant. Also, there is nothing in the record to suggest that when the court appointed the interpreter, the state challenged the propriety of that appointment.

It is important to underscore the doctrinal underpinning of this claim. This claim of the defendant does not rest on a contention of prosecutorial misconduct under the due process clause.[12] Instead, the defendant presents this claim under the principle that "a violation of constitutional magnitude may be established even though there has not been a complete abridgement or deprivation of the right. A constitutional violation may result, therefore, when a constitutional right has been impermissibly burdened or impaired by virtue of state action that unnecessarily chills or penalizes the free exercise of the right." *State* v. *Cassidy*, 236 Conn. 112, 126, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996).

In this regard, therefore, the defendant claims that the state unfairly burdened his constitutionally protected right to the assistance of an interpreter by certain questions that it posed to him on recross-examination, namely: "You say that you don't speak English that well?"; "You were able to get a social security card, right, this one in your wallet?"; and "Are you given any kind of a test when you come to court to decide whether or not you need an interpreter?" In addition, the defendant challenges, on the same ground, the following portion of the state's final argument: "And I'd ask you not to be persuaded by his demeanor when he's on the stand, when he leans over and looks, kind of sits down, slouched over, looks up at the interpreter and says, 'como, como,'[13] like he doesn't know what's going on." We disagree with the defendant.

The following facts underlie this claim. Briggs had testified that, during her contact with the defendant,

---

[12] In part II of this opinion, we consider the defendant's contention that certain portions of the state's final argument constituted prosecutorial misconduct.

[13] The most likely translation of the Spanish word "como" in this context is "how; in what manner . . . why." Cassell's Spanish-English English-Spanish Dictionary.

he repeatedly spoke and understood English, that she did not understand Spanish, and that it was only when he pushed her into the freezer that he spoke in a mixture of Spanish and English. Quinones also testified that the defendant had called out to him in English. In addition, Baez had testified that the defendant spoke "a little English."

On his direct examination, the defendant, through the interpreter, testified to the effect that, when he told the police what had happened to him, he did so in Spanish.[14] On cross-examination, the defendant admitted that he had lived in the United States for six years, and that he had worked at the American Eagle truck stop. He testified that when he worked at the truck stop, he tried once or twice to speak to his supervisor in English, but that she could not understand him. He also testified that he had taken English classes "at city hall." On redirect examination, the defendant testified that he had been taking English classes since his arrest, that before he was arrested he did not speak or understand "certain phrases in English," and that he tried to speak English "but, when I do, they don't understand me too good." On recross-examination, the following exchange took place. The state asked the defendant: "You say that you don't speak English that well?" The defendant responded: "I don't speak it too well." The state then asked: "You were able to get a social security card, right, this one in your wallet?" The defendant objected on the ground that the question was speculative, and the court sustained the objection. The state then asked: "Are you given any kind of a test when you come to court to decide whether or not you need an interpreter?" The defendant objected, without stating any ground, and the court sustained the objection.

[14] The defendant was asked: "Did you tell them what happened?" He responded: "Yes, I did. They brought me a Spanish police officer."

In its final argument, in addressing the identity of the defendant as the assailant, the state argued as follows: "The defendant got up there and testified that he doesn't understand English, doesn't speak any English. He also testified—we heard from Mr. Baez, the roommate. I did hear him speaking English on a few occasions.

"He also got up there and he testified that he had taken English at city hall. Also, he testified that he worked at the truck stop, the 76 Truck Stop in Southington.

"If you think about the words that Miss Briggs remembers hearing. Cash register. Do you think that's a word that he might become familiar with over the years of working at a truck stop? Money. Where's the money, show me the money. That's a word that you become familiar with. Safe. Show me where the safe is. Another word that if you worked at a retail business for three of four years and studied some English, you would know that word.

"And what was the last thing? The manager. There was testimony about the fact that he had a supervisor. There were people in charge of him when he worked at the truck stop for a number of years. Don't you think that the word manager would have come up? Is it that far-fetched that someone who doesn't understand English might know those particular words?

"And I'd ask you not to be persuaded by his demeanor when he's on the stand, when he leans over and looks, kind of sits down, slouched over, looks up at the interpreter and says 'como, como,' like he doesn't know what's going on.

"If I loaded that gun and shut out the lights in this courtroom and put it in his hand, I think everybody would have a very different perception of how dangerous he is."

At that point, the defendant objected stating: "Objection, Your Honor. This appeals to passion and emotion." The court in effect sustained the objection by directing the state: "Move away from that." The defendant did not ask for a curative instruction regarding the state's argument. The state then proceeded to argue regarding the presence of the gun found in the woods, the defendant's hiding in the woods, and the presence of the red shirt found at his feet in the woods.

In his final argument, the defendant, in addressing the issue of identity, contended: "Not disputed during the incident is that all the employees, except for Miss Briggs, exited the store, and she . . . was grabbed by the perpetrator . . . and that this individual spoke predominantly English, sometimes Spanish, while doing so, seeking the money, the manager, the keys to the register." He also argued as follows: "Another [issue] that the state claims is that [the defendant is] responsible for these acts is alleged by the aggressive questioning of whether or not he spoke and understood English at the time of the events. And I know you'll recall Miss Briggs' testimony that she was repeatedly questioned and ordered about the restaurant by an intruder who spoke in English." The defendant also contended: "The patrolman never indicated that [the defendant] spoke English, nor were there any officers called to take the stand and testify as to him speaking a word of English." Finally, in addressing the question of whether the red shirt was with the defendant when he was discovered in the woods, the defendant argued: "It's for you to resolve this conflict, but, resolve it in light of all of the evidence here, and by that I mean the identification situation, the presence of the car, the question about the speaking of English."

In the rebuttal portion of its final argument, the state did not advert to the question of whether the defendant spoke English. It focused, instead, on the positive

nature of the identification of the defendant by the eyewitnesses, the alleged implausibility of his version of events, and the connection between the defendant and the gun in question.

There is no question, and the state does not contest, that with respect to a defendant who has only a limited understanding of English, his "right to confrontation, his right to counsel and his right to be present at trial may be violated if he is not provided with a separate interpreter, who performs the functions of translating for him, into his language, the testimony of English speaking witnesses and interpreting between him and his English speaking counsel during the testimony of all witnesses, both English and nonEnglish speaking." *State* v. *Munoz*, 233 Conn. 106, 133, 659 A.2d 683 (1995). We also do not question the proposition that, consistent with these rights, the court may not unduly burden their exercise by challenging before the jury the defendant's need for an interpreter. *United States* v. *Mayans*, 17 F.3d 1174, 1180–81 (9th Cir. 1994). We conclude, nonetheless, that the defendant cannot prevail on this claim.

The defendant's claim must be considered in the context of the only contested issue at the trial, namely, the identity of the defendant as the assailant. Furthermore, that issue must be viewed through the factual prism that the defendant, both explicitly and implicitly, presented himself as a victim of mistaken identity because, given the fact that the assailant addressed his victims mainly in English, and given the defendant's claimed inability to speak English with any degree of fluency, he could not have been the assailant. This presentation by the defendant was made explicitly by his testimony that he did not speak understandable English, and was made implicitly by his use of a Spanish interpreter. Although the state never challenged the court's appointment of an interpreter for the defendant, the jury necessarily would have had that use in mind in arriving at its deter-

mination of the only contested issue in the case. Thus, in order to meet its burden of establishing the identity of the defendant as the assailant, the state was justified in attempting to counter that defense posture. The state's attempt, therefore, to undermine the defendant's use of an interpreter was not gratuitous, but was directly related to the dispositive factual issue on which it had the burden of proof.

With this background in mind, we return to the defendant's two part claim. Although the defendant has combined the two parts of his claim—based on the state's recross-examination of the defendant, and based on the state's final argument—the proper analyses require that we separate them because different principles apply to each.

We turn first to the part of his claim regarding the questions asked by the state. The first challenged question—"You say that you don't speak English that well?"—was answered by the defendant—"I don't speak it too well."—without objection. Indeed, we can see no basis for an objection, given the trial context that we have just described. The other two questions, regarding his social security card, and regarding whether he was given any test in connection with his request for an interpreter, were objected to, and the court sustained the objections. Absent a basis for an inference that the state was intentionally persisting in asking questions that it knew were improper in order to elicit an impermissible reaction from the jury, or for an inference of some similar brand of prosecutorial bad faith—which the defendant does not claim to be the case—we know of no authority, and the defendant has supplied none, for the proposition that the defendant is deprived of a constitutional right by the state's merely having asked a question or questions to which the defendant successfully objects. Furthermore, the court, in its general charge to the jury, instructed it that it was

not to draw any inferences from questions that were objected to and not answered.

The defendant's challenge to the state's final argument is also unavailing. It is important to note that the defendant challenges only the following part of the state's final argument: "And I'd ask you not to be persuaded by his demeanor when he's on the stand, when he leans over and looks, kind of sits down, slouched over, looks up at the interpreter and says 'como, como,' like he doesn't know what's going on. If I loaded that gun and shut out the lights in this courtroom and put it in his hand, I think everybody would have a different perception of how dangerous he is."

The defendant contends that this argument "unduly burdened the defendant's right to proceed with the assistance of an interpreter." This contention is without merit.

Contrary to the defendant's contention, this claim was not made at trial. In determining whether this contention was made at trial, we must consider the challenged language in the context in which it was used, which was also the context in which the jury heard it. That context demonstrates that it was preceded by a rather lengthy argument by the state, focusing on the contested issue of identity, in which the state reviewed the evidence regarding the defendant's ability to speak English.

The state noted the defendant's testimony that he "doesn't understand English, doesn't speak English." The state then noted the following: Baez' testimony that he had heard the defendant "speaking English on a few occasions"; the defendant's testimony that "he had taken English at city hall" and that he had worked "at the truck stop"; and Briggs' testimony that she had heard the assailant say the words—"[c]ash register," "[w]here's the money," "[s]how me where the safe is,"

and "[t]he manager." The state then argued that it was not far-fetched "that someone who doesn't understand English might know these particular words." Thus, the state's argument was, at least up until this point, simply to the effect that even someone with the defendant's professed lack of fluency in English could well have said what the witnesses attributed to the assailant. Moreover, at this point, the state had not even mentioned the interpreter.

The state then moved to a different topic: the defendant's demeanor on the stand, and a possible inconsistency with that demeanor and the high degree of dangerous conduct evidenced by the assailant. In this regard, the state argued: "And I'd ask you not to be persuaded by his demeanor when he's on the stand, when he leans over and looks, kind of sits down, slouched over, looks up at the interpreter and says, 'como, como,' like he doesn't know what's going on.

*"If I loaded that gun and shut out the lights in this courtroom and put it in his hand, I think everybody would have a very different perception of how dangerous he is."* (Emphasis added.) At that point, and significantly, not before that point, the defendant objected as follows: "Objection, Your Honor. This appeals to passion and emotion." The court in effect sustained the objection by directing the state to "[m]ove away from that."

This record demonstrates that what the defendant was objecting to was not the reference to the interpreter, or to the use of the Spanish word "como," but to the attempt to have the jury, despite the defendant's demeanor on the stand, imagine him with a loaded gun in his hand in the courtroom.[15] That is the only plausible

---

[15] The defendant challenges this argument of the state in his next claim, regarding prosecutorial misconduct, which we address in part II of this opinion.

meaning that can be attributed to the defendant's objection that "[t]his appeals to passion and emotion." It is clear from this record, therefore, that both the trial court and the defense counsel, and most likely the jury, heard the challenged language as it was intended by the state, namely, not as a comment on the defendant's need for an interpreter, but as a comment on his dangerousness despite his demeanor on the stand.[16]

We consider the defendant's claim, therefore, as a claim that was not preserved at trial. It is well settled that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude, alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); *State* v. *Woods*, 250 Conn. 807, 815, 740 A.2d 371 (1999). The first two

---

[16] Indeed, this is further demonstrated by the fact that the defendant's trial attorney at no time, either during the final arguments or posttrial, challenged this language on the basis on which the defendant challenges it on appeal. If it conveyed in the trial courtroom the meaning that the defendant attributes to it on appeal, one would expect that defense trial counsel, who was charged with the obligation of protecting his client's rights, would have at some time said so. There is no indication in this record of that happening. In fact, as the defendant demonstrates in his second set of claims on appeal, cast in terms of prosecutorial misconduct, he characterizes the language challenged here as an "attempt to arouse the jury's fears over their own personal safety with the vivid suggestion that they should imagine themselves in a dark room with the defendant holding a loaded gun"; he characterizes the court's ruling as a "direction to 'move away' from [the prosecutor's] rhetoric asking the jury to imagine the defendant in wholly fictional and menacing circumstances"; and he demonstrates that trial counsel regarded the state's argument in the same manner, by having made that a ground for a posttrial motion for a new trial.

*Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial. *State* v. *Woods*, supra, 815. This court may dispose of the claim on any one of the conditions that the defendant does not meet. *State* v. *Golding*, supra, 240. We conclude that the defendant has not met the third condition because there was no violation of his constitutional rights.

As our prior discussion regarding whether this claim was made at trial indicates, the state did *not* argue in such a way as to burden his right to have an interpreter translate the proceedings into his native language. That was not the thrust of the state's argument, and it was not the way in which it is likely that anyone in the courtroom—trial judge, defense counsel or jury—heard it. The thrust of the argument, instead, focused on the defendant's demeanor on the stand, and the potential conflict between that demeanor and the dangerousness of the assailant described by the state's witnesses.

This does not mean that, in any case in which the defendant avails himself of the services of an interpreter, the state would be free to focus on that fact in a manner that was irrelevant to the issues in the case, or in a manner that unduly casts doubt on the necessity of those services. Nor does it mean that we approve of the state's use of the Spanish word "como" in its argument, or its brief reference to the interpreter. Although we recognize that both parties must be free to argue vigorously, and that we cannot hold an oral final argument to the scrupulous standard of a written appellate brief, we believe that the state's point could have been made just as forcefully without those references. We cannot, however, place the weight of unconstitutionality on those references, taken in their proper context, that the defendant would have us do.

## II

The defendant next claims that in the final argument, the prosecutor engaged in a pattern of prosecutorial misconduct that violated his right to due process of law under the fourteenth amendment to the United States constitution.[17] Specifically, the defendant contends that the prosecutor improperly: (1) appealed to the jury's passion and emotion; (2) repeatedly referred to matters not in evidence; (3) referred to the defendant's ethnicity and language barrier in such a manner as to impugn his character; and (4) vouched for the credibility of the state's witnesses, and gave his personal opinion that the defendant was guilty. We conclude that there was no pattern of prosecutorial misconduct, and that the sole, isolated instance of improper argument did not deprive the defendant of a fair trial.

"Prosecutorial misconduct may . . . occur in the course of closing argument. . . . Such argument may be, in light of all of the facts and circumstances, so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 539, 529 A.2d 653 (1987). "We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Internal quotation marks omitted.) Id., 539–40. Whether the alleged pattern of prosecutorial misconduct rises to the level of denying the defendant's right to due process of law and deprived him of a fair trial depends on a

---

[17] The defendant also makes this claim under article first, § 8, of the Connecticut constitution. Because, however, he presents no independent and adequate analysis under the state constitution, we consider his claim only under the federal constitution. See footnote 10 of this opinion.

number of factors, including the extent to which the misconduct was invited by defense conduct or argument, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues of the case, the strength of the curative instructions adopted, and the strength of the state's case. Id., 540. We consider the defendant's contentions, under these standards, in their inverse order.

The defendant's contention that the prosecutor vouched for the credibility of the state's witnesses and gave his own personal opinion of the defendant's guilt is based on five discrete portions of the state's final argument. The prosecutor argued, in part, as follows: (1) "You hear words like the perpetrator, the assailant, the gunman. Gayle Briggs was there. Chris Acty was there. And that's the perpetrator. That's the assailant. That's the gunman."; (2) "[Briggs] couldn't even handle looking at [the defendant]. Does that impress you that maybe she remembers that person? Of course she remembers him."; (3) "[The defendant] shot Chris Acty, kidnapped Gayle Briggs. They came in here and testified to it."; (4) "Now, Jesus Quinones, he was not a good witness. I mean, I'll admit that."; and (5) that the state's version of the case was the "simplest," and that "the simplest answer is the right answer." The short answer to the defendant's contention is that all of these arguments were based on evidence in the case, and we can perceive nothing in these comments that suggests a personal opinion of the prosecutor regarding the guilt of the defendant. They constituted no more than conventional advocacy regarding how, in the state's view, the jury should view the evidence.

The defendant's contention that the prosecutor impermissibly referred to the defendant's ethnicity and inability to speak English is based on the same portion of the state's final argument that we discussed in his initial claim, namely, that the state unduly burdened his right to have the proceedings translated into his

native Spanish language. As we made clear in our discussion of that claim, that portion of the state's argument, read in its proper context, was appropriately based on the evidence regarding a contested issue in the case, and had neither the intent nor the effect of commenting on the defendant's right to have the services of an interpreter during the trial.

The defendant's argument that the state improperly referred to matters not in evidence is based on two parts of its final argument. The first is that, despite the fact that there was no evidence introduced regarding the presence of a pay telephone in the area of the plaza parking lot near where, according to the defendant's testimony, his car had broken down, the state purportedly referred to such pay telephones.[18] As we view this

[18] The following exchange took place during the state's final argument. The state argued: "[The defendant] stays at the area of the car where they push it underneath this street light and tries to fix the car, and he's not able to fix the car. So what does he do? What would a normal person do? You'd go and find a pay phone. You heard testimony it's a Stop & Shop Plaza. There's all kinds of businesses in that plaza."

The defendant objected: "Objection. This is referring to facts that are not in evidence in regard to pay phones, Your Honor. No witnesses were called in that respect."

The court requested that the state's argument be played back by the court monitor, and without any ruling by the court the prosecutor stated: "That's not what I'm trying to tell you ladies and gentlemen. You heard evidence that there was a plaza with a lot of businesses in it. Whether or not there is a pay phone there or not, would somebody think to go and look there for a pay phone? That's the point I'm trying to make. I'm not saying that there's a pay phone on this corner, or that there was a pay phone next door that he could have used, but, you would go and try and find a pay phone to summon help for yourself.

"So, what does he do? Instead of going to look for a pay phone—whether or not one is there, that's not the point—but, instead of going and looking, he decides, if you follow his version of events, that he is going to the McDonald's to find this person who just went to start work. He doesn't know the person's name. He could hardly even give a physical description of the person. He's going to go and find that person, that stranger, to make a phone call. Does that make any sense?

"And he goes, actually, up to the door, and the lobby door is closed. And then if I recall correctly he said, the door was closed, he didn't know what to do, so, he sat down for a minute to think. Well, now, he can't get to this

argument, however, it did not attempt to inject improper, nonevidentiary facts into the case. The references to pay telephones were simply part of the state's argument that the defendant's version of events was not to be believed, partly because, regardless of whether there were such telephones in the vicinity, the expected course of behavior would have been to seek such a telephone in order to seek help, rather than to do what the defendant claimed to have done in order to explain his presence at the scene of the crimes.

The second aspect of this claim of the defendant is based on that portion of the state's argument referring to the defendant's likely understanding of some level of English, based on his employment at the truck stop, despite the fact that there had been no specific evidence introduced regarding whether he spoke English there.[19]

---

stranger for help, so, maybe you're going to take it upon yourself to go and find a pay phone or go and find help, or do something, but, no, he decides he's got to get into that McDonald's, or he's got to find that particular person.

"So, what he's going to do, he's sitting there on the stoop at McDonald's, and he sees the cars driving around to the drive-thru, so, he decides what I'll do is I'll walk around to the drive-thru, and then he'll be able to communicate, I guess, with someone inside the McDonald's, and they can make the phone call for me.

"As he's going around the back, that's when this person, whoever it is, pulls him in, takes his hat off, hits him in the head with a gun, and then says give me your shirt. Does that make a lot of sense?

"And you heard testimony from his own mouth that he had $100 in his pocket, but, apparently, this robber is more interested in his hat and his shirt. Does that make sense?"

[19] Without objection by the defendant, the state argued as follows: "The defendant got up there and testified that he doesn't understand English, doesn't speak any English. I did hear him speaking English on a few occasions.

"He also got up there and he testified that he had taken English at city hall. Also, he testified that he worked at the truck stop, the 76 Truck Stop in Southington.

"If you think about the words that Miss Briggs remembers hearing. Cash register. Do you think that's a word that he might become familiar with over the years of working at a truck stop? Money. Where's the money, show me the money. That's a word that you become familiar with. Safe. Show

We can perceive nothing improper about the state's argument. It simply asked the jury to perform its appropriate function of drawing inferences from the evidence in the case.

This leaves the defendant's contention that the state improperly appealed to the jury's passion and emotions. This contention is based on the following portion of the argument of the prosecutor: "If I loaded that gun and shut out the lights in this courtroom and put it in his hand, I think everybody would have a very different perception of how dangerous he is." We agree with the defendant that this one sentence went beyond the bounds of proper argument, by improperly evoking feelings of fear on the part of the jurors. We disagree, however, that this one instance of improper argument is sufficient for reversal of the judgment of conviction.

First, when the defendant objected, the court in effect sustained the objection, and the state never returned to the subject. Second, the defendant did not request a curative instruction. Third, the evidence against the defendant was very strong, and his exculpatory evidence regarding the events in question was weak. Considering the isolated nature of the improper argument, we conclude that his due process right to a fair trial was not violated by the state's argument.

The judgment is affirmed.

In this opinion the other justices concurred.

---

me where the safe is. Another word that if you worked at a retail business for three or four years and studied some English, you would know that word.

"And what was the last thing? The manager. There was testimony about the fact that [the defendant] had a supervisor. There were people in charge of him when he worked at the truck stop for a number of years. Don't you think that the word manager would have come up? Is it that far-fetched that someone who doesn't understand that much English might know those particular words?"