******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ANGEL M.*
## (AC 39723)

Keller, Mullins and Elgo, Js.

*Syllabus*

Convicted of the crimes of sexual assault in the first degree, attempt to commit sexual assault in the first degree and risk of injury to a child arising out of his alleged sexual abuse of the minor victim, his stepdaughter, the defendant appealed. *Held*:

1. The trial court did not abuse its discretion by admitting evidence of three incidents of uncharged sexual misconduct involving A, the defendant's daughter: that court properly concluded that the evidence was relevant in light of its findings that A was approximately the same age as was the victim at the time of the alleged abuse, that both girls looked very similar physically, that the defendant was in a position of authority over both girls, and that the charged and uncharged misconduct were sufficiently similar, and although the abuse of the victim occurred four or five years before the alleged abuse of A and the defendant claimed that there was a qualitative difference between A, his biological daughter, and the victim, his stepdaughter, the uncharged misconduct was not too remote in time, and neither the gap in time nor the familial distinction rendered the uncharged misconduct irrelevant to prove that the defendant had a propensity to engage in the charged conduct; moreover, the trial court properly concluded that the probative value of A's testimony was not outweighed by its prejudicial effect, as the uncharged misconduct involved groping A, which was less severe than the charged misconduct concerning the victim, and the court issued limiting instructions that minimized any prejudicial effect of that evidence.

2. The defendant could not prevail on his claim that multiple instances of prosecutorial impropriety during cross-examination and in closing rebuttal argument deprived him of a fair trial: the defendant's claim that the prosecutor improperly referred to facts that were not in evidence when she asked an improper question during cross-examination of the defendant was an unpreserved evidentiary claim and, thus, not reviewable, as it was not of constitutional magnitude, and his claim that the prosecutor improperly referred to facts not in evidence during closing rebuttal argument by mischaracterizing evidence and implying that the defendant never told the police that the allegations were false was unavailing, as the challenged comments were not improper, had an adequate basis in the evidence, simply invited the jury to draw a reasonable inference from the evidence presented and were intended to challenge the defendant's theory that the victim's mother had encouraged the victim and A to fabricate the allegations; moreover, the prosecutor did not appeal to the racial prejudices of the jurors when she referenced the fact that the defendant was born and raised in another country while exploring his background and his views on relationships with minors, and did not improperly appeal to the passions or prejudices of the jury with references to the defendant's ethnicity or ability to speak English, as the prosecutor sought to establish that the defendant spoke and understood English well enough to have informed a police detective about his alibi and that the girls had a motive for accusing him of sexual abuse.

3. Although the prosecutor committed an impropriety when, during cross-examination, she asked the defendant to comment on the veracity of the testimony given by the victim and A, that impropriety did not deprive the defendant of his due process right to a fair trial; because the version of events offered by the victim and A was directly at odds with the defendant's account, there was no way for the jury to reconcile the conflicting testimony except to conclude that someone was lying, and, therefore, it was unlikely that asking the defendant directly whether the victim and A were lying was so prejudicial as to amount to a violation of due process.

4. The defendant could not prevail on his unpreserved claim that the trial court improperly increased his sentence to penalize him for invoking

his fifth amendment privilege against self-incrimination when he refused to apologize to the victim and A at sentencing; the sentencing court properly considered the defendant's denial in evaluating his prospects for rehabilitation, as one consideration among many, in fashioning the sentence imposed, although that court did not explicitly state that it considered the defendant's refusal to admit guilt as indicative of his lack of rehabilitative prospects, it did acknowledge that rehabilitation was one of the factors to be considered in fashioning an appropriate remedy, and even though the sentencing court focused particularly on the defendant's failure to accept responsibility and to apologize to the victim and A in denying him leniency, it expressly stated that it would not punish the defendant for exercising his absolute right not to admit guilt and to appeal his judgment of conviction, and also acknowledged that the defendant had a positive presentence investigation report, that several people spoke on his behalf, and that he successfully had completed a family violence education program, and this court had no reason to doubt the trial court's representation that it did not punish the defendant for exercising his fifth amendment privilege.

Argued September 22, 2017—officially released March 20, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the first degree, attempt to commit sexual assault in the first degree and risk of injury to a child, brought to the Superior Court in the judicial district of Hartford, where the court, *Mullarkey, J.*, denied the defendant's motion to preclude certain evidence; thereafter the case was tried to the jury; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy* and *Anne Mahoney*, state's attorneys, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Angel M., appeals from the judgment of conviction, rendered following a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-70 (a) (2), and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that (1) the trial court erred by admitting uncharged sexual misconduct evidence, (2) the prosecutor engaged in impropriety that deprived him of the constitutional right to a fair trial, and (3) the trial court violated his right to due process at sentencing by penalizing him for exercising his fifth amendment privilege against self-incrimination. Although we agree with the defendant that one of the prosecutor's comments was improper, we, nevertheless, conclude that the defendant was not deprived of his due process right to a fair trial. We reject the defendant's other claims, and we, accordingly, affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. M is the mother of the victim. M became romantically involved with the defendant when the victim was approximately three or four years old. M had two children, G and the victim, from a previous relationship. The defendant was a father figure to the victim, and she was considered his stepdaughter.

Approximately one year after the defendant and M began dating, they had a child together named A. At some point in 2000, the defendant moved in with M. They lived together with the three children, the victim, G, and A, in an apartment in Hartford until they purchased a house in 2008.

In 2006 or 2007, when the victim was approximately twelve years old,[1] she arrived home after school and went into her mother's bedroom to play a game on the family's computer. While she was playing on the computer, the defendant came up behind her and began kissing her neck. The victim froze. Then the defendant picked her up and threw her on the bed. He locked the bedroom door and "did something near the side of the bed" before lifting up the victim's shirt and licking her breasts. The defendant proceeded to lick the victim's vagina before taking off his pants and attempting to put his penis in her vagina. The victim closed her legs, and the defendant got off of her.[2]

Several years after that incident, on the evening of December 18, 2011, the defendant and M were involved in an incident outside of a restaurant in Newington. That evening, M had gone to the restaurant without the defendant. She was socializing with a female friend and another man. The defendant, who had been waiting

impatiently for her to come home, decided to go to the restaurant to find her. When he arrived, he saw M socializing with a man he did not recognize. He became angry. He confronted M in the parking lot and an argument ensued. The defendant struck M multiple times. The police arrived shortly thereafter and arrested the defendant. In January, 2012, a protective order was issued as a result of the incident. Thereafter, the defendant stopped providing financial assistance to M, and he moved out of the house and into his own apartment.

Shortly after the defendant moved out of the house, A ceased all communication with him. The lack of communication between A and the defendant concerned M. As a result, M asked the victim to talk to A in order to figure out why A was ignoring the defendant. On February 7, 2012, the victim started a conversation with A via text messages concerning the change in her relationship with the defendant. In those communications, A told the victim that the defendant had molested her. The victim also revealed that the defendant had molested her, and the victim encouraged A to tell their mother.

Shortly after this conversation, the victim told M that A had been abused by the defendant. Upon learning about the abuse, M contacted A's therapist, Mary Mercado, who reported the abuse to the Department of Children and Families (department). The department referred the case to the Hartford Police Department, and Detective Frank Verrengia investigated the case. The victim and A both participated in forensic interviews in March, 2012. The victim disclosed her abuse during the forensic interview on March 8, 2012. Following an investigation, the police arrested the defendant on April 18, 2013. The case involving A, however, was administratively closed in May, 2013.

The state charged the defendant with one count of sexual assault in the first degree, one count of attempt to commit sexual assault in the first degree, and one count of risk of injury to a child. At trial, the defendant's theory of defense was that the victim and her sister both fabricated the allegations of sexual abuse. Specifically, he claimed that they made these false allegations in retaliation for his having hit their mother during the restaurant incident, and for withdrawing all financial support from the family after moving out of the house. The jury found the defendant guilty on all counts. The court accepted the verdict, rendered a judgment of conviction, and sentenced the defendant to a total effective sentence of forty-five years imprisonment, execution suspended after thirty-three years, with twenty-five years of probation. This appeal followed.

I

The defendant first claims that the trial court abused its discretion by permitting the state to introduce evi-

dence regarding uncharged sexual misconduct involving A, the defendant's biological daughter. We are not persuaded.

The following additional facts and procedural history are relevant to our discussion. Prior to trial, the state filed a "notice of other evidence" detailing the expected testimony of A regarding three incidents of the defendant's prior uncharged sexual misconduct with respect to her. The defendant filed a motion in limine seeking to preclude A's testimony concerning uncharged sexual misconduct, and the court held a hearing outside the presence of the jury.

At the hearing, A testified that the defendant began abusing her when she was eleven years old, approximately four or five years after the sexual abuse of the victim.[3] The first incident occurred while the defendant still was living in the family's house in Hartford. A was talking to the defendant in his bedroom when he started to tongue kiss her. The defendant removed her shirt and continued kissing her, but she was able to push him off of her. She put her shirt back on and left the bedroom. The second incident occurred approximately one week later. This time the defendant attempted to remove A's shirt and touch her breasts at the family home. A was able to get away from him because her sister-in-law arrived at the house and interrupted him. The third incident occurred after the defendant had moved out of the family home to his own apartment. Again, the defendant started by tongue kissing her, and, then, he removed her shirt. The defendant was trying to touch her vagina and breasts, despite A's attempts to push him off of her. During this incident, the defendant attempted to get undressed while he continued touching A, until she suggested that they go to the movies in order to get out of the house.

After hearing argument from both the state and the defendant, the court issued an oral decision on the motion in limine. The court ruled that A's testimony was admissible. The court found that there were a number of similarities between the uncharged conduct and the charged offense, namely, that A was approximately the same age as was the victim at the time of the alleged abuse, that the sisters looked very similar physically, that the defendant was in a position of authority over both girls, and that the pattern of the conduct that began with kissing and progressed to touching and disrobing was consistent. Finally, the court also concluded that the evidence was more probative than prejudicial.

Following the court's ruling on the uncharged misconduct, the jury heard A's testimony with regard to the three instances of sexual abuse perpetrated by the defendant. At the conclusion of her testimony, the court issued a limiting instruction to the jury. Also, in its final charge to the jury, the court specifically explained that "evidence of the defendant's commission of another

offense or offenses is admissible and may be considered by you for its bearing on any propensity or tendency to engage in criminal sexual behavior. However, evidence of another offense on its own is not sufficient to prove the defendant guilty of the crimes charged in the Information."

We begin by setting forth the applicable standard of review and legal principles that govern our analysis of the defendant's claim. "The admission of evidence of . . . uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . [T]he burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant . . . [who] must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *George A.*, 308 Conn. 274, 295, 63 A.3d 918 (2013).

"Generally, [e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person . . . . Conn. Code Evid. § 4-5 (a). Exceptions exist, however, and [e]vidence of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if certain conditions are satisfied. Conn. Code Evid. § 4-5 (b)." (Internal quotation marks omitted.) *State* v. *Acosta*, 326 Conn. 405, 411–12, 164 A.3d 672 (2017).

"Evidence of prior sexual misconduct . . . may be admitted to prove propensity in a sex crime case pursuant to our Supreme Court's holding in *State* v. *DeJesus*, 288 Conn. 418, 476, 953 A.2d 45 (2008), if (1) the trial court finds that such evidence is relevant to the charged crime in that it is not too remote in time, is similar to the offense charged and is committed upon persons similar to the prosecuting witness; and (2) the trial court concludes that the probative value of such evidence outweighs its prejudicial effect. The trial court must [also] . . . provide an appropriate limiting instruction." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 167 Conn. App. 298, 306–307, 142 A.3d 1227, cert. denied, 323 Conn. 929, 149 A.3d 500 (2016).

On appeal, the defendant claims that the court improperly admitted into evidence the uncharged misconduct testimony. Specifically, the defendant argues that the conduct involving A "was significantly different from his conduct with [the victim], and the things they had in common were merely general similarities that occur in the majority of sexual assault cases." The defendant further argues that the probative value of A's testimony did not outweigh its prejudicial effect.

We disagree.

The first prong in our relevancy analysis requires that we evaluate the time between the charged and uncharged misconduct. Here, although the sexual abuse of the victim occurred approximately four or five years[4] prior to the abuse of A, a gap in time is not dispositive in our analysis. See, e.g., *State* v. *Antonaras*, 137 Conn. App. 703, 717, 49 A.3d 783 ("[e]ven a relatively long hiatus between the charged and uncharged misconduct . . . is not, by itself, determinative . . . especially when there are distinct parallels between the prior misconduct and the charged misconduct" [internal quotation marks omitted]), cert. denied, 307 Conn. 936, 56 A.3d 716 (2012). In fact, this court has concluded that a gap of twelve years between charged and uncharged misconduct; id., 716; was "not too remote to render the uncharged misconduct irrelevant to prove that the defendant had a propensity to engage in the charged abuse, particularly in light of the other two prongs." Id., 717. Therefore, the gap of four or five years, in the circumstances of this case, does not render the uncharged misconduct too remote in time.

As to the second prong of our relevancy analysis, namely, the similarity of the uncharged misconduct to the charged offense, the defendant argues that the conduct alleged by A is dissimilar both in frequency and severity to the charged offense. The defendant specifically claims that whereas A testified that he had molested her on three separate occasions, the victim recounted only one incident.[5] Also, the defendant claims that the conduct involved in the charged offense was more severe than the uncharged conduct because it involved cunnilingus and attempted vaginal penetration, rather than only "kissing and touching" A. We are not persuaded.

"It is well established that the victim and the conduct at issue need only be similar—not identical—to sustain the admission of uncharged misconduct evidence. . . . Additionally, differences in the severity of misconduct may not illustrate a behavioral distinction of any significance when a victim rebuffs or reports the misconduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Acosta*, supra, 326 Conn. 416.

"With respect to the similarity of the charged and uncharged misconduct, this court has repeatedly recognized that it need not be so unusual and distinctive as to be like a signature . . . . Rather, the question is whether the evidence is sufficiently similar to demonstrate a propensity to engage in the type of aberrant and compulsive criminal sexual behavior with which [the defendant] . . . [was] charged." (Citation omitted; internal quotation marks omitted.) *State* v. *Devon D.*, 321 Conn. 656, 668, 138 A.3d 849 (2016).

In the present case, the charged and uncharged mis-

conduct are sufficiently similar to be relevant. The incidents all occurred in the defendant's bedroom when he was alone with each girl. In each instance of abuse, the defendant began by kissing the girls before undressing them. The defendant attempted to touch each girl's breasts and vagina. A testified that she attempted to push the defendant off of her on each occasion that he kissed and touched her, and, on one occasion, the abuse only stopped because A's sister-in-law arrived at the defendant's house and interrupted the incident. Although A did not claim that the defendant performed cunnilingus during any of the incidents, or that he attempted to vaginally penetrate her, we conclude that this does "not illustrate a behavioral distinction of any significance" under these circumstances. (Internal quotation marks omitted.) *State* v. *Acosta*, supra, 326 Conn. 416. Indeed, the defendant's assaults on A were substantially similar to, and mirrored, the initial stages of the assault on the victim. See *State* v. *Barry A.*, 145 Conn. App. 582, 593, 76 A.3d 211, cert. denied, 310 Conn. 936, 79 A.3d 889 (2013). Also, this court has stated that "[a]n escalation of sexual assault does not deprive the state of the ability to present the uncharged misconduct." Id. Furthermore, because A rebuffed the defendant's misconduct, the difference in severity does not present a significant behavioral distinction. Thus, under these circumstances, the court properly concluded that the defendant's conduct was sufficiently similar.

Regarding the third and final relevancy prong, the similarity between the witness and the victim, the defendant argues that "there is a qualitative difference between [the] defendant sexually abusing his own biological daughter and abusing someone unrelated to [him]." We disagree.

First, the trial court specifically noted that the two girls were near the same age when the abuse occurred, they are "startlingly similar in appearance," and the defendant was a parental figure to both girls. Second, the defendant had lived with the victim since she was approximately five or six years old, and he was regarded as her stepfather. Indeed, he considered her to be his stepdaughter, and she considered him to be her stepfather. Considering the similarities of the two girls in this case, and the nature of the defendant's relationship with each girl, it is insignificant that the victim was his stepdaughter rather than his biological daughter. See *State* v. *Barry A.*, supra, 145 Conn. App. 584, 593 (witness and victim similar despite fact that victim was defendant's adopted child and witness was defendant's biological daughter).

Having concluded that the trial court properly found the uncharged misconduct evidence was relevant under the *DeJesus* factors, we consider whether the trial court properly concluded that its probative value was not outweighed by its prejudicial effect. The defendant

claims that the probative value of the uncharged misconduct involving A was outweighed by its prejudicial effect. Specifically, the defendant argues that A's testimony involved incest and, therefore, it was "even more egregious than his conduct involving [the victim]." We disagree.

"We previously have held that the process of balancing probative value and prejudicial effect is critical to the determination of whether other crime[s] evidence is admissible. . . . At the same time, however, we . . . do not . . . requir[e] a trial court to use some talismanic phraseology in order to satisfy this balancing process. Rather . . . in order for this test to be satisfied, a reviewing court must be able to infer from the entire record that the trial court considered the prejudicial effect of the evidence against its probative nature before making a ruling. . . . In conducting this balancing test, the question before the trial court is not whether [the evidence] is damaging to the defendant but whether [the evidence] will improperly arouse the emotions of the jur[ors]." (Citation omitted; internal quotation marks omitted.) *State* v. *Devon D.*, supra, 321 Conn. 673. Additionally, "[p]roper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct. . . . Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting from the admission of such evidence." (Internal quotation marks omitted.) *State* v. *Morales*, 164 Conn. App. 143, 180, 136 A.3d 278, cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016).

Upon our review of the record, it is evident that the trial court considered the prejudicial effect of the evidence. In its oral decision, the court noted that the evidence "is not shocking [and] doesn't unduly delay the trial. . . . [W]hile it's not helpful to the defendant, the probative value here strongly outweighs the prejudicial effect." We agree and conclude that, although the uncharged misconduct evidence was not helpful to the defendant, it was not the type of evidence that improperly would arouse the emotions of the jury. In light of the fact that the victim was regarded as the defendant's stepdaughter, the defendant's assertion that because A's testimony involved incest, the uncharged misconduct was even more egregious than the charged crime, is unavailing. Moreover, the uncharged misconduct was less severe than the charged misconduct—i.e., groping versus cunnilingus and attempted vaginal penetration.

Furthermore, at the conclusion of A's testimony, the court issued a limiting instruction explaining to the jury the appropriate use of uncharged misconduct evidence. Additionally, the court issued another limiting instruction in its final charge to the jury at the close of the evidence. The limiting instructions minimized any prejudicial effect of this evidence. Accordingly, we con-

clude that the trial court did not abuse its discretion in permitting A to testify regarding the uncharged sexual misconduct.

## II

The defendant next claims that the prosecutor committed several improprieties during cross-examination and closing argument that deprived him of a fair trial. Specifically, he claims that the prosecutor improperly (1) asked the defendant to comment on other witnesses' credibility in violation of *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), (2) referred to facts not in evidence, and (3) appealed to the jury's emotions, passions, and prejudices. We will address each of these claims in turn.

Before addressing each specific claim of impropriety, the following general principles guide our analysis. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . We first examine whether prosecutorial impropriety occurred." (Internal quotation marks omitted.) *State* v. *Carlos E.*, 158 Conn. App. 646, 659-60, 120 A.3d 1239, cert. denied, 319 Conn. 909, 125 A.3d 199 (2015). "Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Citations omitted; internal quotation marks omitted.) Id., 660.

"The defendant bears the burden of satisfying both of these analytical steps. . . . In evaluating whether a defendant has carried that burden, we recognize that prosecutorial inquiries or comments that might be questionable when read in a vacuum often are, indeed, appropriate when review[ed] . . . in the context of the entire trial." (Citation omitted; internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 524, 122 A.3d 555 (2015).

## A

The defendant first claims that the prosecutor improperly asked him to comment on the veracity of other witnesses during cross-examination in violation of *State* v. *Singh*, supra, 259 Conn. 693. The state argues that the prosecutor "did not ask the defendant to comment on the veracity of other witnesses, but, rather, [she] rhetorically challenged the defendant's testimony denying the accusations, and suggesting that the girls may have been motivated to falsely accuse him." We agree with the defendant.

The following additional facts are relevant to our consideration of the defendant's claim. At trial, the defendant testified on his own behalf. On both direct examination and cross-examination, the defendant denied the allegations made by both A and the victim.

The prosecutor asked the defendant: "But you have no explanation for these allegations that [A] is saying that you sexually molested her, the only explanation you have other than it's the truth, is that you left the home and she might have been upset about that?" The prosecutor further inquired, "but you know the girls are telling the truth, don't you?" The defendant responded by stating: "They're lying."

We begin by recognizing that "[i]t is well established that questions seeking a witness' opinion regarding the veracity of another witness are barred. . . . The underlying basis for such a rule is to prohibit a fact witness from invading the jury's exclusive function to determine the credibility of witnesses. . . . [Q]uestions of this sort . . . create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. . . . This prohibition includes questions that ask whether another witness is lying, mistaken, wrong, or incorrect." (Citations omitted; internal quotation marks omitted.) *State* v. *Rios*, 171 Conn. App. 1, 31, 156 A.3d 18, cert. denied, 325 Conn. 914, 159 A.3d 232 (2017).

A review of the transcript demonstrates that the prosecutor's questions sought the defendant's opinion regarding the veracity of A and the victim. Although framed rhetorically, the prosecutor still asked the defendant to comment on the truth of the testimony given by the victim and A. This is precisely the line of questioning that is prohibited by *Singh*. Accordingly, we conclude that the prosecutor's questions were improper.

B

The defendant next claims that on multiple occasions the prosecutor improperly referred to facts not in evidence. Specifically, he claims that the prosecutor referred to facts not in evidence (1) during cross-examination of the defendant and (2) during closing rebuttal argument. We disagree.

1

The following additional facts are relevant to the defendant's claim. The victim testified that the defendant "did something near the side of the bed" before attempting to "put his private" in her. During cross-examination of the defendant, regarding his alleged conduct during the incident described by the victim, the prosecutor asked: "And you went to the cabinet to get a condom?" Defense counsel did not object to the prosecutor's question and the defendant replied, "Nope." The prosecutor did not mention this colloquy or a condom in closing argument.

The defendant argues that "[b]y improperly injecting the idea of a condom without any such evidence, the prosecutor made it appear as though [the] defendant did intend to have vaginal intercourse with the victim.

thereby improperly bolstering her testimony." The state argues that this claim is "unreviewable because it is an evidentiary claim masquerading as a claim of prosecutorial impropriety." We agree with the state.

"In *State* v. *Stevenson*, [269 Conn. 563, 572–73, 849 A.2d 626 (2004)], our Supreme Court held that, in cases of claimed prosecutorial impropriety, it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. . . . Such a claim of prosecutorial impropriety must, however, be premised on conduct that is of truly constitutional magnitude, and not mere evidentiary conduct clothed in constitutional garb." (Footnote omitted; internal quotation marks omitted.) *State* v. *Alex B.*, 150 Conn. App. 584, 588, 90 A.3d 1078, cert. denied, 312 Conn. 924, 94 A.3d 1202 (2014).

Essentially, the defendant's claim is that the prosecutor committed an impropriety by asking an improper question. Although framed as prosecutorial impropriety, upon further review, we conclude that this claim is purely evidentiary.

First, defense counsel did not object to the prosecutor's question, and, therefore, any evidentiary claim regarding the question is unpreserved. Second, the defendant has not alleged that the prosecutor deliberately violated a court order, which should be reviewed as prosecutorial impropriety. See *State* v. *Williams*, 102 Conn. App. 168, 176, 926 A.2d 7 ("appellate courts of this state have held that evidentiary violations of a court order should be reviewed as prosecutorial [impropriety], not evidentiary errors"), cert. denied, 284 Conn. 906, 931 A.2d 267 (2007). Finally, the consequence of defense counsel's failure to object is indicative of the evidentiary nature of the defendant's claim of prosecutorial impropriety. If the defendant had objected, then the prosecutor would have had an opportunity to assert a good faith basis for asking the question.[6] See *State* v. *Robles*, 103 Conn. App. 383, 391 n.5, 930 A.2d 27 ("[w]ithout trial objection, the prosecutor was denied the opportunity to present to the court the basis for questioning the witness"), cert. denied, 284 Conn. 928, 934 A.2d 244 (2007).

"As our Supreme Court has repeatedly held, [a]ppellate review of prosecutorial [impropriety] claims is not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that clearly have deprived a criminal defendant of his right to a fair trial." (Internal quotation marks omitted.) *State* v. *Ampero*, 144 Conn. App. 706, 723, 72 A.3d 435, cert. denied, 310 Conn. 914, 76 A.3d 631 (2013). Consistent with well established precedent, we decline to review the defendant's unpreserved evidentiary claim under the prosecutorial impro-

priety framework. See *State* v. *Golding*, supra, 213 Conn. 241 ("once identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed").

2

The defendant also claims that the prosecutor improperly referred to facts not in evidence during closing rebuttal argument. The defendant essentially argues that the prosecutor mischaracterized the evidence by implying that the defendant never told the police that the allegations were false. We disagree.

The record reveals the following additional relevant facts and procedural history. Detective Frank Verrengia was the lead investigator for the cases involving A and the victim. Approximately three months after the girls' initial complaints, Verrengia interviewed the defendant at his attorney's office. Verrengia testified at the trial and, during his testimony, defense counsel attempted to elicit from him whether the defendant had denied the allegations made by A and the victim during that initial interview. The prosecutor objected on hearsay grounds and the court sustained the objection.

During the defendant's testimony, defense counsel inquired of the defendant whether he had denied the allegations during the interview with Verrengia, and the defendant responded: "I answered all of his questions." When the defendant was asked how he felt when he learned about the accusations, he said: "My world collapsed. I was angry, I was stressed. I couldn't believe my family would do something like this to me, my own daughter, my stepdaughter as well."

On cross-examination, the prosecutor repeatedly asked the defendant whether he was able to provide Verrengia with an explanation for the allegations of sexual abuse, and he claimed that he told the detective that the victim likely was mad at him for moving out of the house and refusing to provide financial support to M.[7] Following the defendant's testimony, the prosecutor called Verrengia as a rebuttal witness. The prosecutor asked whether the defendant provided an explanation for why A would have accused him of sexual abuse, and Verrengia responded that he did not.

Defense counsel repeatedly referred to the timing of the girls' accusations of sexual assault against the defendant in relation to the domestic violence incident. In particular, during his cross-examination of M, defense counsel emphasized the fact that the allegations of sexual assault only surfaced a mere fifty-four days after he had been arrested for hitting M, despite the fact that the sexual assaults allegedly had occurred several years prior to his assault of M. He asked M, "[i]s the reason these allegations came out fifty-four days after [the defendant] gets arrested for hitting you because you were mad at him?" Then, in his closing

argument, defense counsel argued that the girls' allegations were fabricated and that they only made these claims of sexual abuse after the domestic violence incident with M on December 18, 2011. He also referred to the interview with Verrengia, claiming that the defendant "denied the allegations and that was it." Defense counsel further argued: "If you didn't do something, you say I didn't do it, this is false, and that's what he did."

The prosecutor, in her rebuttal argument, responded to defense counsel's closing argument, arguing that the defendant could have said "this is all made up, [M] made these kids make this up because I hit her. He doesn't say any of that. He doesn't come up with any reason why [A] would say this at all and what he says with [the victim] is he says she's mad that I left the house." In her final remarks, the prosecutor commented: "Wouldn't you expect somebody who is falsely accused of this to say I cannot believe these children said this about me, I cannot believe [M] put them up to this? But that is not what he says when he's interviewed by the police and it's not what he says in the courtroom."

The defendant contends that the prosecutor mischaracterized the evidence because there was no evidence that he did not say to Verrengia that the allegations were made up. Moreover, according to the defendant, the prosecutor's comments "injected extraneous matters into the trial by suggesting that in her experience, that was how innocent people behaved." The state responds that the challenged remarks had an adequate basis in the evidence and were intended to challenge the defendant's theory, raised for the first time at trial, that M had encouraged the girls to make the accusations of sexual abuse. We agree with the state.

"Claims involving prosecutorial impropriety during the course of closing arguments require a court to evaluate a prosecutor's statements not for their possible meaning, but for the manner in which the jury reasonably and likely would have understood them. Because the meaning of words and statements typically is dependent on the context in which they are used, a court must carefully consider a prosecutor's challenged statements by carefully considering their context in the entire trial, including the remainder of the state's closing argument." (Internal quotation marks omitted.) *State* v. *LaVoie*, 158 Conn. App. 256, 275-76, 118 A.3d 708, cert. denied, 319 Conn. 929, 125 A.3d 203 (2015), cert. denied, U.S. , 136 S. Ct. 1519, 194 L. Ed. 2d 604 (2016).

"A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . [T]he state may [however] properly respond to inferences raised by the defendant's closing argument. . . . Furthermore, [a] prose-

cutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Fasanelli*, 163 Conn. App. 170, 188-89, 133 A.3d 921 (2016).

A prosecutor also is not permitted "to comment unfairly on the evidence adduced at trial so as to mislead the jury. . . . We certainly do not condone paraphrasing or embellishing on a witness' testimony, but we also recognize that the parties are allowed a certain degree of latitude to express their views of what evidence was presented at trial." (Internal quotation marks omitted.) *State* v. *D'Haity*, 99 Conn. App. 375, 388, 914 A.2d 570, cert. denied, 282 Conn. 912, 924 A.2d 137 (2007).

Defense counsel directed the jury to the defendant's interview with Verrengia, claiming that the defendant denied the allegations in that interview. He argued that "if you didn't do something, you say you didn't do it, this is false, and that's what he did." In reiterating the defense's theory of the case, he argued: "[I]t happened four or five years ago, but fifty-three days . . . after [the defendant] hits [M] the allegations come out. After the allegations come out, the cat's out of the bag, you can't uncork that genie, it's out there."

In response, the prosecutor challenged the defendant's theory by also directing the jury to the defendant's interview with Verrengia. The prosecutor invited the jury to draw a reasonable inference from the defendant's failure to mention the domestic violence incident to Verrengia, and his inability to provide a reason to explain A's allegations. That inference was that because he did not tell Verrengia about M's motive to encourage the girls to make the allegations, the defendant never said to Verrengia: "[M] made these kids make this up because I hit her."

Here, the prosecutor's comments regarding what the defendant did not say during the interview with Verrengia did not "invite sheer speculation unconnected to the evidence." (Internal quotation marks omitted.) *State* v. *Fasanelli*, supra, 163 Conn. App. 189. The jury heard evidence from Verrengia that the defendant was unable to provide a reason to Verrengia for A's accusations. Additionally, the defendant testified that he did not tell Verrengia that he had been arrested for hitting the girls' mother. The prosecutor argued that if the defendant believed that M encouraged the girls to fabricate the allegations of abuse as a response to the domestic violence incident, then he would have told Verrengia about the incident and he would have offered that explanation for the allegations during that initial interview. His own acknowledgement that he did not tell Verrengia about hitting M, and that he was unable to provide an explanation for why A would make up these allegations, support the inference that he did not say to Verrengia that these

allegations are made up because he hit M.

Our review of the trial transcript convinces us that the prosecutor's remarks were not improper. Presumably, defense counsel did not believe the remarks were improper because he did not object at the time that the remarks were made. See *State* v. *Carlos E.*, supra, 158 Conn. App. 660 ("failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time" [internal quotation marks omitted]). The defendant focuses on portions of the prosecutor's comments in isolation. When the closing arguments are examined in full, however, it is clear that the prosecutor's remarks simply invited the jury to draw a reasonable inference from the evidence presented at trial. Specifically, the prosecutor sought to have the jury infer from the defendant's failure to tell Verrengia about the girls' motive to falsely accuse him, that defense counsel's argument that M encouraged the girls to make these accusations was not the truth. Rather, it was simply a trial strategy developed by the defendant. Just as defense counsel offered his view of the testimony regarding the defendant's interview with Verrengia, so too did the prosecutor. Accordingly, we conclude that the prosecutor did not improperly refer to facts not in evidence during rebuttal argument.

C

The defendant next claims that the prosecutor appealed "to the prejudices of the jurors against non-English speaking persons and persons of a different ethnicity through her gratuitous questioning of [the] defendant." He argues that the prosecutor's questioning "injected [the] defendant's ethnicity into the case and used it in an attempt to inflame the jurors against him . . . ." The defendant's claim refers to two separate portions of the prosecutor's cross-examination of the defendant, and a portion of the prosecutor's closing rebuttal argument. We address each in turn.[8]

1

First, the defendant argues that the prosecutor's question regarding Puerto Rico, and subsequent reference to Puerto Rico during rebuttal argument, improperly appealed to the jury's racial prejudices. Specifically, he argues that "[i]t was particularly offensive that the prosecutor asked [the] defendant if he had been taught in Puerto Rico that it was [alright] to sexually assault a young girl and [then argued in closing] 'that even he recognized' it was inappropriate." We disagree.

The following additional facts are relevant to this aspect of the defendant's claim. During the prosecutor's cross-examination of the defendant, with the assistance of a Spanish interpreter, the following colloquy occurred:

"[The Prosecutor]: You are originally from Puerto

Rico?

"[The Defendant]: Yes.

"[The Prosecutor]: And you are not say[ing] that in Puerto Rico that behavior of licking a girl's breasts or genitals would be considered okay?"

At this point, defense counsel objected claiming that the question is prejudicial, and the court instructed the prosecutor that the question should be rephrased. The prosecutor then continued:

"[The Prosecutor]: Where you [are] originally from, were you taught that it was okay for a male to lick [the] breasts or genitals of a twelve year old girl?

"[The Defendant]: Can the question be repeated?

"[The Prosecutor]: Sure. Where you are originally from, you were not taught that it is okay for an adult male to lick the genitals or the breasts of a twelve year old girl?

"[The Defendant]: They told me that that was legal.

"[The Prosecutor]: They told you that was legal?

"[The Defendant]: Yes."

Defense counsel objected, arguing that the defendant's answer was not translated properly. The court instructed the prosecutor to ask the question again.

"[The Prosecutor]: Where you were from originally, were you taught that it was okay for an adult male to lick the breasts or genitals of a twelve year old girl?

"[The Defendant]: No."

The prosecutor returned to this exchange during rebuttal argument, explaining to the jury that she "was trying to elicit from the defendant . . . that in any culture where [he has] been, it hasn't been okay for an adult to do that. That even he recognizes that it's not okay for an adult to basically have this kind of sexual contact with a minor."

In evaluating the defendant's claim, we are mindful that "the line between comments that risk invoking the passions and prejudices of the jurors and those that are permissible rhetorical flourishes is not always easy to draw. The more closely the comments are connected to relevant facts disclosed by the evidence, however, the more likely they will be deemed permissible." *State v. Albino*, 312 Conn. 763, 773, 97 A.3d 478 (2014).

Contrary to the defendant's contention, the prosecutor's questions did not improperly inject the defendant's ethnicity into the trial. Although we recognize, as did the trial court, that the prosecutor's question could have been asked without the reference to Puerto Rico, we do not conclude that such a reference indicates an improper appeal to the passions or prejudices of the jury. The defendant testified on direct examination that

he was born and raised in Puerto Rico and lived there until 1990, when he was approximately twenty-one years old. Thus, there was evidence that the defendant was born and raised in Puerto Rico, which the prosecutor was permitted to reference while exploring the defendant's background and his views on relationships with minors. The prosecutor was not focused on Puerto Rico; she merely was making the point that having sexual relations with a twelve year old girl is impermissible in all of the United States. Again, the prosecutor certainly did not have to reference Puerto Rico in order to make this point, and, although the reference may even have been ill-advised, "[w]e cannot . . . place the weight of unconstitutionality on [this reference], taken in [its] proper context . . . ." *State* v. *Heredia*, 253 Conn. 543, 560, 754 A.2d 114 (2000). Moreover, "[w]e do not assume that every statement made by the prosecutor was intended to have its most damaging meaning." (Internal quotation marks omitted.) *State* v. *James E.*, 154 Conn. App. 795, 821, 112 A.3d 791 (2015), aff'd, 327 Conn. 212, 173 A.3d 380 (2017).

For similar reasons, the prosecutor's subsequent reference to this line of questioning during closing argument was not improper. "[B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury . . . . [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Elias V.*, 168 Conn. App. 321, 347, 147 A.3d 1102, cert. denied, 323 Conn. 938, 151 A.3d 386 (2016). Accordingly, we conclude that the prosecutor's remark, which was designed to elicit from the defendant that "even he recognizes that it's not okay for an adult to do that" does not rise to the level of prosecutorial impropriety.[9] It was a rhetorical flourish, expressed in the heat of argument. Cf. *State* v. *Warholic*, 278 Conn. 354, 374–75, 897 A.2d 569 (2006) (concluding that Appellate Court properly determined prosecutor's comments that characterized defendant as child molester and appeals to jury's fears that child molesters are " 'out there' " and " 'among us' " were improper).

2

The defendant also claims that the prosecutor appealed to the passions and prejudices of the jury against non-English speaking persons. Specifically, the defendant argues that his ability to speak English was not at issue in this case and, therefore, "the prosecutor's persistent cross-examination and closing argument [on his English speaking ability] was an implicit appeal to the racial prejudices and emotions of the jurors." The defendant contends that the prosecutor effectively

diverted the jurors' attention away from the relevant issues and invited the jury to decide the case based on their prejudices and emotions. We disagree.

The following additional facts are relevant to the defendant's claim. From his initial court appearance, the defendant required the services of an interpreter. On direct-examination, defense counsel asked the defendant where he was born and whether he spoke English. The defendant responded that he was born in Puerto Rico and that he does not speak English. The defendant also testified that at the time that the victim claimed the sexual assault occurred, he would not have been home because he was working a second job. There is nothing in the record that suggests that the defendant had claimed this alibi prior to his testimony at trial.

During cross-examination, the prosecutor questioned the defendant regarding his ability to speak English. The prosecutor asked the defendant approximately fourteen distinct questions concerning his ability to speak and understand English.[10]

Our review of the record reveals that the prosecutor's questions, when viewed in the context of the defendant's entire testimony, were not improper. On direct examination, defense counsel asked the defendant if he speaks English. The defendant answered that he did not and the prosecutor explored this answer during cross-examination. During closing argument, the prosecutor relied on the defendant's subsequent admission that he, in fact, spoke some English in order to argue that he was capable of denying the allegations and claiming that M put the girls up to making the allegations against him at the beginning of the investigation, as opposed to offering this explanation for the first time at trial.

We agree with the trial court's conclusion that the prosecutor's inquiry was relevant and appropriate. Although the prosecutor asked several questions regarding the defendant's ability to speak English, we note that the court overruled several of defense counsel's objections during cross-examination.[11] When defense counsel objected on the basis of relevance, the prosecutor explained that her inquiry was directed at the nature of the interview in order to address what the defendant told Verrengia during that initial interview; the court agreed, and overruled the objection.

Our resolution of this claim is informed by our Supreme Court's decision in *State* v. *Heredia*, supra, 253 Conn. 543. In *Heredia*, our Supreme Court concluded that the prosecutor's references to the defendant's ethnicity and ability to speak English did not constitute prosecutorial impropriety. Id., 559–60, 562–63. The assailant spoke English during the commission of the crime and the defendant claimed that he did not speak English and, therefore, he was not the assailant.

Id., 555–56. The court reasoned that the prosecutor's comments were "appropriately based on the evidence regarding a contested issue in the case . . . ." Id., 563. The court, however, cautioned that a prosecutor is not "free to focus on [the defendant's use of an interpreter] in a manner that was irrelevant to the issues in the case . . . ." Id., 560.

The defendant's attempt to distinguish the present case from *State* v. *Heredia*, supra, 253 Conn. 543, is unavailing. The defendant argues that, unlike in *Heredia*, his ethnicity and ability to speak English were not issues in the present case. According to the defendant, his ability to speak English was not relevant because he did not claim that he could not understand the officer's questions or that he was unable to answer questions due to his inability to speak English. Our review of the record contradicts the defendant's claims.

Although the defendant argues that his ability to speak English was not an issue in this case, his ability to communicate with Verrengia was relevant to several of his claims at trial. First, the defendant testified that he did not speak English. In fact, he claimed to have difficulty answering all of Verrengia's questions, stating: "There were things I couldn't answer because I didn't know what he was saying because my English is not that good." Second, he attempted to establish an alibi for the first time at trial, testifying that he was working two jobs at the time the alleged abuse occurred, despite never revealing this to Verrengia during the initial investigation. Finally, despite his failure to mention the domestic violence incident to Verrengia, the defense's theory of the case was that these allegations simply were retaliation for that incident. Thus, the prosecutor's questions regarding the defendant's ability to speak English were relevant to her argument that he was perfectly capable of telling Verrengia these details during the initial interview. In other words, the prosecutor sought to establish that the defendant spoke and understood English well enough to have informed Verrengia about his alibi, and that the girls had a motive for accusing him of sexual abuse.

Under these circumstances, we do not agree that the prosecutor's questions were improper. The questions, although numerous, were not "irrelevant to the issues in the case" and there is no indication that prosecutor attempted to challenge the defendant's need for the services of an interpreter.

### D

Having concluded in part II A of this opinion that the prosecutor's questions that required the defendant to comment on the veracity of other witnesses' testimony were improper, we now must determine whether the impropriety deprived the defendant of his due process right to a fair trial.

"An appellate court's determination of whether any improper conduct by the prosecutor violated the defendant's right to a fair trial is predicated on the factors established in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Those factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Carlos E.*, supra, 158 Conn. App. 660.

As our Supreme Court recognized in *State* v. *Jones*, 320 Conn. 22, 128 A.3d 431 (2015), "the risk that a defendant will be prejudiced by a *Singh* violation may be especially acute when the state's case is founded on the credibility of its witnesses. . . . As the present case demonstrates, however, that general proposition is not a universal truth. In a case that pits the testimony of the defendant against that of the victim, such that the victim's version of events is directly at odds with the defendant's account of the facts, and there is no way to reconcile their conflicting testimony except to conclude that one of them is lying, it is unlikely that asking the defendant directly whether the victim is lying ever could be so prejudicial as to amount to a denial of due process. Cf. *State* v. *Fauci*, 282 Conn. 23, 39, 917 A.2d 978 (2007) (in a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and thus to argue, that one of the two sides is lying . . .). To be sure, as we explained in *State* v. *Singh*, supra, 259 Conn. 707–10, such questioning is never appropriate, and we consistently have declined the state's invitation to carve out an exception to the prohibition against[questions such as] are they lying . . . in cases involving pure credibility contests. We have done so, however, not because we disagreed with the underlying rationale for such an exception but, rather, because of the difficulty of determining, in the midst of trial, whether the case presents a pure credibility contest or whether the testimonial discrepancies between the two witnesses may be explained by reasons other than perjury or deceit. . . .

"[B]ecause *Williams* requires that we determine whether the prosecutorial impropriety prejudiced the defendant by evaluating the impropriety in the context of the entire trial, we must consider whether it was possible for the jury to reconcile the testimony of the defendant and [the witness on whose credibility the defendant was asked to comment] without concluding that one of them was lying. When, as in the present case, it is not possible to do so, there is no reasonable possibility that asking the defendant whether the victim testified truthfully would render the trial so unfair as

to rise to the level of a due process violation because, in such circumstances, the risks that ordinarily attend such a question simply are not present." (Citations omitted; internal quotation marks omitted.) *State* v. *Jones*, supra, 320 Conn. 45-46.

In the present case, it was not possible for the jury to reconcile the testimony of the defendant and the girls. The defendant denied ever touching the girls inappropriately and defense counsel argued that the girls fabricated the allegations. Thus, the defendant's position was that the abuse never occurred. In contrast, the victim and A testified that the defendant inappropriately touched them in a sexual manner. There was no forensic evidence in this case. Therefore, with these two diametrically opposed positions, just as in *Jones*, the jury was required to determine which of these two conflicting stories was the truth and which was a lie. "Thus, the answer that the defendant gave in response to the prosecutor's improper . . . question, although irrelevant, could not have caused the defendant undue harm." Id., 47. Accordingly, we conclude that the *Singh* violation did not deprive the defendant of his due process right to a fair trial.

### III

The defendant's final claim is that the trial court improperly increased his sentence in order to penalize him for invoking his fifth amendment privilege against self-incrimination when he refused to apologize to the victims at the sentencing.[12] The defendant argues that the court violated his right to due process by penalizing him for remaining silent at sentencing. We disagree.

The following additional facts are relevant to this claim. At the sentencing hearing, the state did not provide a specific recommendation for a sentence. The state simply requested a "significant sentence" for the defendant, while making clear that there was a mandatory minimum for the charged offenses. The state also noted that the defendant's "unwillingness to participate in any sex offender treatment programs or to acknowledge any criminal behavior . . . puts him at a much higher risk" to reoffend.

The defendant was afforded an opportunity to address the court and present additional mitigating evidence. The court heard from several individuals in support of the defendant's good character. One such individual was the defendant's current romantic partner, who has a teenage daughter, with whom the defendant had been residing during the proceedings.

Before being sentenced, the defendant engaged in the following colloquy with the court:

"[The Defendant]: The jurors found me guilty. I am innocent of these charges presented against me, and I want to appeal this case.

"The Court: Well I appreciate your position, but in a case like this, the lifetime effects on the victims can be lessened if the person who committed these acts, particularly in a familial relationship, whether father or stepfather, takes responsibility. I know you wish to appeal and that does create a dilemma.

"[The Court Interpreter]: Your Honor, may that be repeated for the interpreter?

"The Court: Well apologizing, admitting what he did, taking responsibility will help the victims enormously at least that has been my experience over four decades in this business. However it puts a crimp in your ability to appeal, do you understand that?

"[The Defendant]: I did understand. But how would I say sorry for something that I did not do, these are just allegations? I love my daughter; I worked really hard for them. This was hard for me. And I work hard to support this family, two, three jobs to have our home and to lose everything because of these allegations it's not fair.

"The Court: Well that's your decision, sir. If you wish to continue to deny it, that's your absolute right. *The court will not punish you for that*; however, *you do not get any extra credit*. Do you have anything else you wish to say?

"[The Defendant]: No. That's it for now." (Emphasis added.)

Thereafter, the court addressed the defendant and explained that "sentencings have to do with [the] four following considerations: rehabilitation, deterrence, protection of society, and punishment." The court acknowledged that the defendant had a positive presentence investigation report and that several people spoke on his behalf. The court considered the defendant's demeanor during the trial and his successful completion of a family violence education program. The court, however, repeated that "in this type of case, it is most helpful to the victims to have an admission or an apology." Importantly, the court expressed concern that the defendant was currently living with another woman and her teenage daughter. After noting that it had "taken all these things into account and . . . tried to balance the seriousness of this offense," the court sentenced the defendant to a total effective sentence of forty-five years imprisonment, execution suspended after thirty-three years, to be followed by twenty-five years of probation.

We begin by noting that the defendant did not object to the claimed violation of his fifth amendment rights at the sentencing hearing. Therefore, this claim is unpreserved. The defendant's claim, however, is reviewable pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, because the record is adequate for review and the claim

that the defendant was punished for exercising his fifth amendment right is of constitutional magnitude. Therefore, we proceed to the third prong of *Golding* to determine whether a constitutional violation exists, thereby depriving the defendant of a fair trial. See id., as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

We recognize that "it is clearly improper to increase a defendant's sentence based on [his or her] decision to stand on [his or her] right to put the [g]overnment to its proof rather than plead guilty . . . . Nevertheless, a defendant's general lack of remorse . . . and refusal to accept responsibility . . . for crimes of which he was convicted are legitimate sentencing considerations . . . . [R]eview of claims that a trial court lengthened a defendant's sentence as a punishment for exercising his or her constitutional right to a jury trial should be based on the totality of the circumstances. . . . [T]he burden of proof in such cases rests with the defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Collymore*, 168 Conn. App. 847, 897, 148 A.3d 1059 (2016), cert. granted on other grounds, 324 Conn. 913, 153 A.3d 1288 (2017).

"[A]lthough a court may deny leniency to an accused who . . . elects to exercise a statutory or constitutional right, a court may not penalize an accused for exercising such a right by increasing his or her sentence solely because of that election." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 762, 91 A.3d 862 (2014).

In the present case, the defendant argues that "the court never once mentioned [his] prospects for rehabilitation or that the lack of an admission of guilt somehow showed he had no such prospects. . . . Rather, the court's sole concern was how his refusal to admit guilt would impact [A and the victim]." We disagree.

In *State* v. *Huey*, 199 Conn. 121, 128, 505 A.2d 1242 (1986), our Supreme Court held that the sentencing judge was "justified in considering the defendant's denial in evaluating his prospects for rehabilitation, as one consideration among many, in fashioning the sentence imposed." The defendant attempts to distinguish the present case from *Huey* by arguing that the court did not state specifically that it considered his refusal to admit guilt as indicative of his lack of rehabilitative prospects. Although the defendant is correct that the court did not state this explicitly, the court did acknowledge that rehabilitation is one of the factors to be considered in fashioning an appropriate sentence.[13]

Indeed, a review of the sentencing transcript demonstrates that the court considered legitimate sentencing factors in determining the length of the sentence. "The defendant's demeanor, criminal history, presentence investigation report, prospect for rehabilitation and

general lack of remorse for the crimes of which he has been convicted remain legitimate sentencing considerations." (Internal quotation marks omitted.) *State* v. *Elson*, supra, 311 Conn. 782. The court outlined the factors that it considered in arriving at the sentence, focusing particularly on the defendant's failure to accept responsibility and his failure to apologize to the victims.[14] See, e.g., *State* v. *Barnes*, 33 Conn. App. 603, 610, 637 A.2d 398 ("sentencing judge properly related the defendant's refusal to admit responsibility and claims of innocence to the likelihood of his rehabilitation"), aff'd, 232 Conn. 740, 657 A.2d 611 (1995).

Moreover, the court expressly stated that it would not punish the defendant for exercising his "absolute right" to not admit guilt and appeal his judgment of conviction, but it would not give him any "extra credit." The court's statements comport with the principle that a court may deny leniency to a defendant for exercising a constitutional right, but it may not punish him or her for exercising such a right. See *State* v. *Elson*, supra, 311 Conn. 762. The defendant has provided no reason for this court to doubt the trial court's representation that it was not going to punish the defendant for exercising his "absolute right." See *State* v. *Dickman*, 119 Conn. App. 581, 599, 989 A.2d 613 ("The court, however, specifically stated that it had not taken those charges into consideration in sentencing the defendant. We have no reason to doubt the court's representation, and the defendant has provided none."), cert. denied, 295 Conn. 923, 991 A.2d 569 (2010).

Accordingly, we conclude that the trial court did not penalize the defendant for exercising his fifth amendment privilege against self-incrimination. Therefore, the court did not violate the defendant's right to due process of law.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identities may be ascertained. See General Statutes § 54-86e.

[1] The victim did not remember exactly how old she was when the sexual abuse occurred, but she testified that she would have been twelve or thirteen because she was in middle school when it happened. She also testified that the abuse took place while the family was living in the apartment in Hartford, during the spring or summer, rather than the house that the defendant and M purchased in 2008.

[2] In addition to the victim's testimony regarding the sexual abuse, the jury heard testimony from three constancy of accusation witnesses. The first was K, the victim's childhood friend. She testified that when they were in fifth or sixth grade, the victim told her that the defendant had molested her. She also testified that the victim provided more details about the molestation when they were freshmen in high school. K's father was the second constancy witness. Although he could not remember an exact date, he recalled the victim telling him that the defendant had molested her. The third witness, G, the victim's brother, testified that the victim had told him via a text message that she had been "touched." He testified that he received the text message at some point in 2010 while he was in Europe.

The victim also testified that the defendant would kiss her neck "and

stuff" every time that she would go on the computer and that on one occasion she woke up and saw the defendant in her bedroom pulling his hands out of his pants. In this case, however, the state only charged the defendant on the basis of the single incident in her mother's bedroom that involved cunnilingus and attempted vaginal penetration.

[3] A testified that she was eleven years old when the defendant began to abuse her, which would have been around 2011.

[4] The victim was not able to testify as to a specific year in which the incident occurred. See footnote 1 of this opinion.

[5] Although the charges against the defendant were based on a single incident, as previously noted, the victim did testify that the defendant would kiss her neck "and stuff" whenever she was on the computer in the bedroom.

[6] Although unnecessary to our resolution of the defendant's claim, our review of the record indicates that there was a factual basis for the prosecutor's question. The victim's testimony indicated that the defendant "did something" by the side of the bed and the prosecutor's question related to what the defendant did by the side of the bed. Furthermore, this was an isolated question and the prosecutor did not refer to this colloquy or a condom at any other point during the trial.

[7] The full context of these exchanges between the prosecutor and the defendant are as follows:

"Q. You told the police that [the victim] was angry at you for leaving the home?

"A. It was possible she was mad because of the allegations that she made. . . .

"Q. You told the police . . . you could give them no reason why [A] would make the allegations against you that she did?

"A. I told them it was more than likely she was upset because I left the house and I have not paid any of the bills, the mortgage or anything like that. . . .

"Q. The police asked you if there was any reason why [A] would say these allegations, these sexual allegations against you?

"A. No. . . .

"Q. And the detective asked you why would [A] say these things about you and you could think of no reason why she would say this?

"A. The detective didn't ask me concrete questions.

"Q. Okay. You did not tell the detective that you had hit [M]?

"A. No.

\* \* \*

"Q. But you claimed you gave [the girls] no reason to make up these allegations against you, right?

"A. Correct. . . .

"Q. And the only explanation you could give to the detective was that you had left the home and the victim might have been mad about that?

"A. The detective knew there was a domestic [violence incident] and a restraining [order].

"Q. Did you tell him that?

"A. I didn't know. He knew.

"Q. How do you know he knew?

"A. My attorney that I had . . . he said."

[8] The state argues that the defendant's claim is an unreviewable evidentiary claim because "defense counsel either failed to object, or objected on purely evidentiary grounds, and the trial court issued a ruling that he does not challenge on appeal." We disagree.

In *State* v. *Andrews*, 313 Conn. 266, 96 A.3d 1199 (2014), our Supreme Court reviewed a defendant's claim of prosecutorial impropriety premised on a prosecutor's denigration of the defendant "through frequent and gratuitous use of sarcasm" during cross-examination. Id., 283. By reviewing the defendant's claim, the court implicitly rejected the state's argument that "the defendant has merely lumped together a number of unpreserved evidentiary challenges and labeled them as prosecutorial improprieties for the purpose of obtaining appellate review that otherwise would be unavailable." Id. Similarly, in the present case, the defendant claims that the prosecutor appealed to the passions and prejudices of the jury through her "gratuitous questioning of [the] defendant." Accordingly, we conclude that the defendant's claim is not purely evidentiary, and "we consider each alleged impropriety in the context in which it occurred . . . ." Id., 284.

[9] Even assuming, arguendo, that the prosecutor's comments were improper, we are not persuaded that the *Williams* factors weigh in the defendant's favor. Although the comments were not invited by defense

counsel, the question and subsequent comment about the question, did not amount to severe impropriety. Defense counsel did object to the question referencing Puerto Rico, but he did not object to the subsequent reference in closing argument. Moreover, defense counsel did not seek any curative instruction. Additionally, these comments were not frequent and the defendant's ethnicity was not central to his credibility, the critical issue in this case. Finally, the state's case was strong in that the victim's allegations were corroborated by three constancy of accusation witnesses, and A's testimony. Accordingly, we could not conclude that the defendant was deprived of the right to a fair trial, even if we were to assume that the comments were improper.

[10] The following are the relevant portions of the prosecutor's cross-examination of the defendant:

"[The Prosecutor]: And the children spoke to you in English?"

"[The Defendant]: They understand Spanish.

"[The Prosecutor]: But they spoke to you in English?"

"[The Defendant]: A little bit because I don't know a lot . . . .

"[The Prosecutor]: Well you spoke to them in English?"

Defense counsel objected, claiming the question was argumentative, and the court overruled the objection. The colloquy continued:

"[The Prosecutor]: You spoke to them in English?

"[The Defendant]: [A] little bit. I wanted to learn, and I had to practice.

"[The Prosecutor]: Right. And your bosses . . . spoke to you in English?

"[The Defendant]: Yes.

"[The Prosecutor]: And you spoke to the police about this case in English?

"[The Defendant]: Yes.

"[The Prosecutor]: And the first time you heard about these allegations was from the [department] worker . . . right?

"[The Defendant]: Yes. . . .

"[The Prosecutor]: And he spoke to you in English?

"[The Defendant]: Yes. . . .

"[The Prosecutor]: And [the police] spoke to you in English?

* * *

"[The Prosecutor]: So the police spoke to you, the police officer, Detective Verrengia, he spoke to you in English, right?

"[The Defendant]: Yes.

"[The Prosecutor]: And you did not have [a] translator in the room?

"[The Defendant]: There were things I couldn't answer because I didn't know what he was saying because my English is not that good. . . .

"[The Prosecutor]: Okay. You didn't ask the police for a translator?

"[The Defendant]: We didn't have long conversations.

"[The Prosecutor]: When the police were talking to you in your lawyer's office, you did not ask the police to provide a translator, did you?

"[The Defendant]: No.

"[The Prosecutor]: And you did not ask the [department] worker for a translator, did you?

"[The Defendant]: He looked Hispanic so if I did not understand; I could ask him a question. . . .

"[The Prosecutor]: He never actually ever spoke to you in Spanish?"

Defense counsel objected and the court stated, "I think we have explored the bilingual nature enough; let's move on."

[11] The court effectively overruled two of defense counsel's three objections during the prosecutor's cross-examination regarding the defendant's ability to speak English.

"[Defense Counsel]: Objection, Your Honor.

"The Court: What's the nature of the objection?

"[Defense Counsel]: Argumentative. . . .

"[Defense Counsel]: Arguing with the witness.

"The Court: No. You can answer that if you know.

* * *

"[Defense Counsel]: Objection, Your Honor, relevance. . . .

"[The Prosecutor]: Well he's testified about certain things. He's claimed he said certain things, Your Honor, I'm simply moving toward what he disclosed and what he didn't disclose to the police and he claimed for the first time today and he can walk through how that took place.

"[Defense Counsel]: Your Honor, the one question by sister counsel implies that [the defendant] is fluent in the English language. I don't believe it's germane to this case, which is sexual abuse.

"[The Prosecutor]: The state is not claiming he's fluent in English, Your Honor. The state is not making a claim against him in using a translator so

he can understand everything he's being asked now. I'm simply pointing out that the interview conducted by the police was in English and his responses were in English.

"The Court: You can inquire about that.

\* \* \*

"[Defense Counsel]: Objection, Your Honor. Facts not in evidence about a conversation. Facts not in evidence, she's talking about a [department] conversation, the nature of it.

"The Court: You put the [department] worker on the stand.

"[The Prosecutor]: He's previously testified the worker spoke in English, Your Honor.

"The Court: All right. I think we've explored the bilingual nature enough; let's move on."

[12] The defendant also asks this court, if we conclude that there was not a constitutional violation, to invoke its supervisory powers to vacate his sentence and remand the case for resentencing before a different judge. We decline to do so because our supervisory authority is intended to be utilized sparingly and only in extraordinary circumstances, which are not present here. See *State* v. *Collymore*, 168 Conn. App. 847, 898 n.27, 148 A.3d 1059 (2016), cert. granted on other grounds, 324 Conn. 913, 153 A.3d 1288 (2017).

[13] Because we conclude that our decision is controlled by our Supreme Court's decision in *State* v. *Huey*, supra, 199 Conn. 121, we are not persuaded by the defendant's citation to cases from other jurisdictions for the proposition that a court may not consider a defendant's silence at sentencing as an indication of a lack of remorse.

[14] Although the defendant was not convicted on any charges related to A, it is well settled that the sentencing court may consider any relevant information at sentencing, so long as it exhibits some "indicium of reliability." See *State* v. *Ruffin*, 144 Conn. App. 387, 395, 71 A.3d 695 (2013) ("[t]o arrive at a just sentence, a sentencing judge may consider . . . evidence of crimes for which the defendant was indicted but neither tried nor convicted . . . evidence bearing on charges for which the defendant was acquitted . . . and evidence of counts of an indictment which has been dismissed by the government" [internal quotation marks omitted]), aff'd, 316 Conn. 20, 110 A.3d 1225 (2015). Moreover, the defendant has not claimed, in this appeal, that the trial court inappropriately considered information relating to A in fashioning the sentence.